## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| MELBA MOORE, ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | |
| ) | **Civil Action No. 2014-0081** |
| U.S. VIRGIN ISLANDS DEPARTMENT OF ) | |
| TOURISM, ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

**Attorneys:**
**Lee J. Rohn, Esq.,**
**Mary Faith Carpenter, Esq.,**
**Rhea Lawrence, Esq.,**
St. Croix, U.S.V.I.
        *For Plaintiff*

**Shari N. D'Andrade, Esq.,**
St. Croix, U.S.V.I.
        *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant's "Amended Motion for Summary Judgment" (Dkt. No. 65); Plaintiff's "Revised Opposition to Defendant's Motion for Summary Judgment" (Dkt. No. 66); and Defendant's "Reply to Opposition to Motion for Summary Judgment" (Dkt. No. 68). For the reasons that follow, Defendant's Amended Motion for Summary Judgment will be granted in part and denied in part. Specifically, the Motion will be granted as it pertains to Plaintiff's claims for wrongful termination, defamation, and breach of the duty of good faith and fair dealing, and will be denied as to the claims for sexual harassment, retaliation, and violations of the Virgin Islands Civil Rights Act.

## I.    BACKGROUND

### A.    Procedural History

Plaintiff Melba Moore ("Plaintiff") brings this action against Defendant U.S. Virgin Islands Department of Tourism ("Defendant"). In Count I, Plaintiff alleges discrimination on the basis of sex, race, religion and national origin under 42 U.S.C. § 2000e ("Title VII"), and discrimination on the basis of race, color and age under 42 U.S.C. § 1981. Plaintiff also brings claims for sexual harassment (Count II), retaliation (Count III), violations of the Virgin Islands Civil Rights Act ("VICRA") (Count IV), wrongful termination (Count V), defamation (Count VI), and breach of the duty of good faith and fair dealing (Count VII). Plaintiff seeks compensatory damages, as well as attorneys' fees and costs, and pre- and post-judgment interest. (Dkt. No. 1).

Defendant has filed an Amended Motion for Summary Judgment, in which it seeks judgment as a matter of law on the claims alleging sexual harassment, retaliation, violations of VICRA, wrongful termination, defamation, and breach of the duty of good faith and fair dealing. (Dkt. No. 65). Plaintiff concedes that summary judgment is appropriate with respect to her wrongful termination and defamation claims, (Dkt. No. 66 at 1), but otherwise opposes the Motion. (Dkt. No. 66).

### B.    Factual Background[1]

In November 2012, Alvin Milligan ("Milligan") interviewed Plaintiff Melba Moore ("Plaintiff") for a job at the Virgin Islands Department of Tourism ("Tourism"). (Dkt. Nos. 67 at 1-2; 58-1 at 4). Plaintiff was not hired, but after the interview, Plaintiff asserts that Milligan began

---

[1] The "facts" set forth herein are based on the various assertions of the parties as presented in their respective pleadings and filings, and in the underlying discovery. They do not constitute findings of the Court by a preponderance of the evidence. Rather, they are recited solely for purposes of resolving Defendant's Motion for Summary Judgment—that is, to determine whether Defendant is entitled to judgment as a matter of law or whether there are genuine issues of fact for trial.

sending her messages via Facebook, asking if she would visit him because he was "lonely." (Dkt. Nos. 67 at 2; 58-1 at 7). Plaintiff rebuffed Milligan's requests. (Dkt. Nos. 58-1 at 7-9; 58-19 at ¶ 6). In April 2013, Plaintiff ran into Milligan while shopping and Milligan told her to come and see him the next day at Tourism, as he had a job for her. (Dkt. No. 58-3 at 7). Milligan hired Plaintiff as a "welcome greeter" that next day. (Dkt. No. 67 at 2).

Plaintiff's "welcome greeter" services were procured by a contractual agreement ("Contract") beginning on May 20, 2013. (Dkt. No. 52 at 1, 8). The Contract specified the days and number of hours to be worked, hourly rate of compensation, and that Plaintiff was obligated to pay any taxes related to her compensation. *Id.* at 1. The Contract was for a six-month term, with an option for extension by mutual agreement of the parties. (Dkt. No. 52 at 1-2). It contained a General Release of liability, executed by Plaintiff, and reserved for the Government the right to terminate the Contract—with or without cause—in its sole discretion. *Id.* at 2. Plaintiff received no benefits from Tourism, other than her salary, during the time that she was engaged as a greeter. (Dkt. No. 52-1 at 2).

Defendant asserts that Plaintiff's services were a minor part of the regular business of Tourism and that "Plaintiff's hours were dictated by tourist activity," such as flight schedules and port calls. (Dkt. No. 52 at 2, 7). Greeters, including Plaintiff, were compensated through invoices that itemized work performed. *Id.* at 2. Pursuant to the Contract, greeter hours were tracked by punching a time clock or signing a time sheet. (Dkt. No. 52-1 at 1). Defendant provided greeters with two uniform shirts, dictated the color of pants to be worn, and allowed only minimal accessories. Greeters also were prohibited from receiving tips during work hours or from using cell phones. *Id.*

Milligan was Plaintiff's supervisor at Tourism. (Dkt. No. 52 at 3). On September 25, 2013,

3

after issues allegedly arose regarding Plaintiff's punctuality and professionalism, Milligan gave Plaintiff a formal written warning. (Dkt. Nos. 52 at 2-3; 52-11). On October 11, 2013, Milligan sent an email to Brad Nugent ("Nugent"), the Assistant Commissioner of Tourism, and Beverly Nicholson-Doty ("Nicholson-Doty"), the Commissioner of Tourism, stating that he was "still having issues with [Plaintiff] constantly being late" and that he was recommending a three-day suspension for her. (Dkt. No. 58-22).

Plaintiff then came forward with allegations that Milligan had sexually harassed her. (Dkt. No. 52 at 3-4). Plaintiff allegedly told Kisa Harris ("Harris"), Tourism's Senior Information Officer, that Milligan subjected her to the following incidents of sexual harassment:

(1) that on June 20, 2013, Milligan came to Government House, where Plaintiff was working, and asked Plaintiff to spend time with him (Dkt. Nos. 58-1 at 7; 58-2 at ¶ 11);

(2) that in June 2013, Milligan sent Plaintiff a text message stating, "I want to sit on your face" (Dkt. No. 58-1 at 7);

(3) that, starting in September 2013, when Plaintiff was assigned to work in the same Frederiksted office as Milligan, Milligan offered her money for sex and would request sex three or four times per week (Dkt. Nos. 58-1 at 8; 58-2 at ¶¶ 14-16);

(4) that in November 2013, Milligan came to Plaintiff's desk and asked if she changed her mind about having sex with him, and that when she rebuffed him, he drew a dollar sign on a piece of paper, circled the dollar sign, wrote the words "no strings", and then verbally asked her again for sex (Dkt. No. 58-1 at 9).

Plaintiff states that she discussed these allegations with Harris "during the summer of 2013." (Dkt. No. 67 at 18). Harris testified at her deposition that Plaintiff showed her the picture of a dollar sign, which Milligan allegedly drew in an effort to entice Plaintiff to give him sex in exchange for money and stated that she felt disgusted by it. (Dkt. No. 52-13). Harris further testified that she informed Plaintiff to contact Nugent to make a formal complaint. (Dkt. Nos. 52 at 4; 52-13; 58-4 at 7). Harris then recommended moving Plaintiff's work location to the

Frederiksted pier so that Plaintiff could better address her tardiness and attendance issues, although Harris testified that this recommendation had nothing to do with Plaintiff's report about Milligan's conduct. (Dkt. No. 58-4 at 6-7). Harris also testified that she would have supervisory control over Plaintiff on days when Plaintiff would be working at the pier. (Dkt. No. 58-4 at 6).[2]

Plaintiff states that she discussed Milligan's alleged advances with two other Tourism employees—a male employee named Shamari Haynes ("Haynes"), and a female employee named Rikiya Heywood ("Heywood"). (Dkt. No. 58-2 at ¶ 18). Both Haynes and Heywood testified that they also lodged complaints against Milligan. (Dkt. Nos. 58-6 at 5; 58-5 at 5-6). Haynes complained that Milligan sent him a text message that he interpreted to contain sexual advances and that, on later occasions, Milligan sent him pictures of male genitalia. (Dkt. No. 58-6 at 4-5). Haynes testified that he informed Nugent of Milligan's behavior. *Id.* at 5. Heywood testified that Milligan asked her out on dates and told her "your p***y looked fat." (Dkt. No. 58-5 at 15). Harris confirmed that Heywood, like Plaintiff, informed her of Milligan's alleged behavior. (Dkt. No. 58-4 at 8). Harris explained that she did not speak to Milligan or Nugent about Heywood's comments, "because [Heywood] told [her] she dealt with Milligan on her own." *Id.*

On November 24, 2013, Plaintiff informed Haynes and Nugent, but not Milligan, that she would be late for her shift at Tourism's Visitor's Bureau. (Dkt. No. 58-6 at 6). When Milligan saw that Plaintiff was not present at work, Milligan asked Haynes about Plaintiff's whereabouts, and, according to Haynes, Milligan "started on a ranting, venting session" and said, "I don't want no

---

[2] Plaintiff states, in reference to Milligan's advances, "I had been repeatedly telling Kisa Harris who, I thought was a supervisor of me as she was senior information officer. I have since found that that is not true." (Dkt. No. 58-2 at ¶¶ 17-18).

internet p***y." *Id.* at 6.[3] Plaintiff, who was ill and had a raspy voice, arrived about 30-45 minutes later. When she arrived, Milligan allegedly forced her to work outside, where she would have to speak to tourists, despite having no voice. *Id.* at 6-7. While tourists were coming in and out of the Visitor's Bureau, Milligan allegedly vented about Plaintiff for at least an hour, stating that Plaintiff and Nugent "are f**king," that Plaintiff was having an affair with a Virgin Islands Port Authority officer, that Plaintiff "f**ks everybody," and that he did not "want no internet p***y." (*Id.* at 6-7; Dkt. Nos. 58-1 at 10; 58-4 at 14-15).

The next day—November 25, 2013—Plaintiff complained about Milligan's conduct to Nugent. (Dkt. No. 52 at 4). Nugent informed Nicholson-Doty about the complaint, and both Nugent and Nicholson-Doty then reported the complaint to the Director of the Division of Personnel. *Id.* at 4-5. Milligan sent an email to Nugent on November 26, 2013 in which he reiterated his same frustrations with Plaintiff's tardiness, explaining that Plaintiff had "been showing up to work late on several occasions." (Dkt. No. 58-15). Milligan prefaced the e-mail by stating "[a]s per text on Saturday," implying that Milligan had already made Nugent aware of the incident at the Visitor's Bureau. Plaintiff claims that after her complaint to Nugent, Milligan refused to schedule her for two weeks. (Dkt. No. 58-1 at 11).

On December 2, 2013, Tourism launched an investigation into Plaintiff's complaint regarding Milligan. (Dkt. No. 52-1 at 5). Plaintiff claims that Milligan breached the confidentiality of the investigation—in violation of Government of the Virgin Islands policy—by posting a Facebook message in which he discussed the investigation. (Dkt. No. 58-1 at 10-11). Nugent also conducted his own initial investigation by speaking to Moore and Haynes. The information he

---

[3] Haynes testified that "internet p***y" referred to the fact that Plaintiff had previously produced nude pictures of herself on the Internet. (Dkt. No. 58-6 at 6).

gathered was consistent with their accounts of Milligan's behavior. (Dkt. No. 58-16).

Defendant assigned Kurrell Hodge, Defendant's EEO Administrator, to investigate the matter. (Dkt. No. 58-9 at 9-10). Milligan denied to Hodge that he had drawn the dollar sign on the paper. *Id.* at 22-23. Milligan also told Hodge that Plaintiff and Nugent had "an inappropriate relationship" (Dkt. No. 68-8 at 4), and that because of that relationship, "[Nugent] is someone who would be on the conspiracy to make allegations against me." (Dkt. No. 58-12 at 12). Harris made similar allegations about a relationship between Plaintiff and Nugent in her interview with Hodge, but admitted that she had no firsthand knowledge of such a relationship. (Dkt. No. 58-4 at 17, 20). Plaintiff denied to Hodge that she was romantically involved with Nugent. (Dkt. No. 58-9 at 23). Nonetheless, because of Milligan's and Harris' statements, the focus of Hodge's investigation shifted to a broader investigation of Nugent's management style. *Id.* at 19. Hodge found the results of the inquiry into Milligan's conduct to be "inconclusive," allegedly due to Hodge's concerns regarding witness credibility issues and inconsistent testimony.[4] However, Hodge also concluded that "based on the evidence available it is likely that inappropriate behavior is occurring within the Department of Tourism but the occurrence of specific incidents cannot be fairly determined." (Dkt. No. 58-12 at 21). Hodge further noted: "The retaliation concern is of paramount importance and that concern presumably prevented candid responses from witnesses." *Id.* Hodge made recommendations to address low employee morale and lack of confidence in management. *Id.* The

---

[4] In the investigative report, Hodge noted that the following specific allegations were supported by witness statements but unsupported by documentation: (1) Milligan sent the text message to Plaintiff stating "I want you to sit on my face;" (2) Milligan commented on Heywood's Facebook picture by stating "that look fat yah;" (3) Milligan shared pictures of male sexual organs with Haynes; and (4) Milligan docked Plaintiff's pay. (Dkt. No. 58-12 at 17). Hodge also noted that the allegation that Milligan verbally propositioned Plaintiff for sex and wrote the "$ No Strings" sign on Plaintiff's notepad was supported by witness statements, but she was unable to support or refute the allegation based on the documentation presented. *Id.*

recommendations included annual sexual harassment training, including for managers, and the addition of such training to the Welcome Greeter Orientation Agenda. *Id.* at 20.

Hodge sent her report to the Division of Personnel on February 28, 2014. (Dkt. No. 58-9 at 28). No action was taken against Milligan. (Dkt. No. 52 at 6). During the investigation, Milligan was selected by his peers as "Employee of the Year." (Dkt. No. 58-17 at 29). According to Plaintiff, on or around March 31, 2014, Nugent sent Nicholson-Doty a memorandum advocating against Milligan receiving this award and informed her of five other instances of alleged sexual harassment by Milligan at Tourism. (Dkt. No. 58-2 at ¶ 38).

On April 9, 2014, after the conclusion of the investigation, Plaintiff was involved in a physical altercation with Harris at the airport. (Dkt. No. 52 at 6). Plaintiff claims that Harris came to Tourism's airport office where Plaintiff was working that day. (Dkt. No. 58-2 at ¶ 27). According to Plaintiff, Harris complained that a Virgin Islands Port Authority ("VIPA") employee was in the office and Harris "attempted to start a big commotion," although Plaintiff insists that the VIPA employee was not there to visit her. *Id.* at 5. After Plaintiff tried to explain the situation, Harris "began to waive her hand in [Plaintiff's] face." *Id.* at 5. Plaintiff then started to leave the room, saying "that the whole thing was a waste of time." Harris responded, "[n]o, you are a friggin waste." *Id.* Plaintiff states that, in the course of this exchange, Harris "went to put her hands in my face again and her hand went in my mouth." *Id.* Plaintiff reported the incident to Nugent and the VIPA police. *Id.* An investigation by Tourism concluded that Plaintiff's lack of professionalism led to the fracas. (Dkt. No. 52 at 6). According to Tourism, this investigation led to Plaintiff's suspension. (Dkt. No. 52 at 7).

While Plaintiff remained suspended, Defendant issued a suspension letter to Nugent on April 14, 2014. (Dkt. No. 58-17 at 21). Nugent then submitted a resignation letter on April 22,

2014. *Id.* at 22. The following day, Nicholson-Doty "decided not to renew Plaintiff's [C]ontract" in the wake of the altercation, and informed Plaintiff accordingly on April 23, 2014. (Dkt. No. 52-25).[5] Defendant asserts that the decision not to renew Plaintiff's contract was the result of chronic performance issues, brought to a head when the physical altercation occurred, and had nothing to do with Plaintiff's sexual harassment complaint. (Dkt. Nos. 52 at 6-8; 52-22 at 2-3).

### C.   The Parties' Arguments

Defendant argues that Plaintiff's Title VII claims in Counts I, II, and III are subject to dismissal because Plaintiff was an independent contractor rather than an employee.  (Dkt. No. 65 at 9).  Plaintiff's territorial claims in Counts IV-VIII, Defendant argues, are also subject to dismissal—either on the merits or, alternatively, because the Court would lack supplemental jurisdiction to hear them upon dismissal of the Title VII claims. *Id.* Defendant also argues that Plaintiff's sexual harassment claim must fail because Plaintiff welcomed the alleged harassing conduct and that, in any event, Defendant took prompt remedial action pursuant to its internal sexual harassment policy. *Id.* at 9-14. Further, Defendant contends that Plaintiff's retaliation claim must be dismissed because Defendant terminated her for poor performance rather than for her complaints alleging sexual harassment. *Id.*  at 15-16. Finally, Defendant argues that Plaintiff's claim for breach of the duty of good faith and fair dealing must fail because Plaintiff put forth no evidence—or even any allegations—that Defendant "made any knowing misrepresentations or promises with the intent for Plaintiff to rely." *Id.* at 19.

In response, Plaintiff argues that she is a covered employee under Title VII because Defendant exercised significant control over her. (Dkt. No. 66 at 10-12). Further, she contends that

---

[5] Plaintiff's contract, signed in May 2013, was for six months, and would therefore have expired in November 2013. Although Plaintiff continued to work past November 2013, there was no renewal of the contract—only a decision not to renew the contract in April 2014.

she did not welcome the alleged harassment; that Defendant did not abide by its sexual harassment policy; and that Defendant conducted a faulty investigation once she voiced her complaints. *Id.* at 12-20. Plaintiff also contends that her retaliation claim should survive Defendant's motion because she has offered evidence that her termination was a direct consequence of the altercation at the airport, coupled with Milligan's efforts to shield Harris from bearing any responsibility for initiating the altercation. *Id.* at 23-25. Finally, she states that Defendant violated the duty of good faith and fair dealing by "turn[ing] a blind eye to oppressive sexual harassment in the workplace." *Id.* at 30.

## II.    LEGAL STANDARD

To prevail on a motion for summary judgment, a movant must show that there is "no genuine dispute as to any material fact," and that, on the uncontroverted facts, it is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Bonkowski v. Oberg Indus.*, 787 F.3d 190, 195 n.1 (3d Cir. 2015). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Mahoney v. McDonnell*, 616 F. App'x 500, 504 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or . . . vague statements." *Patterson v. Glory Foods, Inc.*, 555 F. App'x 207, 211 (3d Cir. 2014) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) (internal quotation marks omitted; alteration in original)); *see also* FED. R. CIV. P. 56(c).

In reviewing a motion for summary judgment, "[a]ll facts are viewed in the light most favorable to the nonmoving party, who is 'entitled to every reasonable inference that can be drawn from the record.'" *Seamans v. Temple Univ.*, 744 F.3d 853, 859 (3d Cir. 2014) (quoting *Merkle v.*

10

*Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000)). In addition, "at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Anderson v. Warden of Berks Cnty. Prison*, 602 F. App'x 892, 895 (3d Cir. 2015) (quoting *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (internal quotation marks omitted)).

The role of the Court is to "determine whether there is a genuine issue for trial." *Stiegel v. Peters Twp.*, 600 F. App'x 60, 63 (3d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (internal quotation marks omitted)). A genuine issue of material fact exists when the fact-finder, viewing the record evidence, could rationally find in favor of the non-moving party. *See Anderson*, 477 U.S. at 248 ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). When a genuine issue of material fact exists, summary judgment is inappropriate. *See Fontroy v. Beard*, 559 F.3d 173, 182 (3d Cir. 2009) (citations omitted).

### III.   DISCUSSION

#### A.   Employee vs. Independent Contractor

In order to establish an employment discrimination claim under Title VII, a Plaintiff must show, as a threshold matter, that he or she is an employee. *Holtzman v. The World Book Co.*, 174 F. Supp. 2d 251, 252 (E.D. Pa. 2001). Defendant first argues that it is entitled to summary judgment because Plaintiff cannot establish, as a matter of law, that she is an employee rather than an independent contractor.

Under Title VII, the term "employee" is defined as "an individual employed by an employer . . . ." 42 U.S.C. § 2000e(f). The United States Supreme Court has endorsed the principles of agency law as set forth in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), to give

11

meaning to this definition. *Walters v. Metro. Educ. Enterprises, Inc.*, 519 U.S. 202, 211 (1997).

Under the analysis laid out by the Supreme Court:

> we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. at 323-24 (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)). The central point of this analysis is the "hiring party's right to control the manner and means by which the product is accomplished." *Cmty. for Creative Non-Violence v. Reid,* 490 U.S. at 751-52.

The *Darden* factors and principles of agency law determine who is an employee for purposes of Title VII claims, not the label given to a party's status in the contract governing the parties' relationship. *See McFeeley v. Jackson Street Entm't, LLC*, 825 F.3d 235, 239, 241 (4th Cir. 2016) (exotic dancers were employees even though they had signed a contract that labeled them as "independent contractors"). Contractual arrangements held not to constitute employee status under *Darden* usually fall into the category of an independent contractor, which affords the individual a great deal of control over how the work is conducted. The plaintiff in *Brown v. J. Kaz, Inc.,* 581 F.3d 175, 180-81 (3d Cir. 2009), for example, was a salesperson who had the freedom to create her own schedule and develop her own sales pitch. She was provided with no office space, vehicle, or equipment, and was paid purely on commission. *Id.* at 181. Similarly, the plaintiff in *Holtzman v. The World Book Co.*, 174 F. Supp. 2d at 256-57, worked from home; had total discretion over how to conduct her work; was not provided with any tools or office supplies; received no benefits; and was paid on commission.

Defendant asserts that Plaintiff's Title VII claims must fail as a matter of law because she was an independent contractor rather than an employee. (Dkt. No. 65 at 7-8). In support of this position, Defendant highlights that, by contract, Plaintiff was compensated only for hours worked through itemized invoices; received no benefits; and was responsible for her own taxes. (Dkt. No. 65 at 8-9). Defendant also argues that Plaintiff worked only on an "as needed" basis; no more than twenty hours per week; and her service was "a minor part of Tourism's actual operations." *Id.*

Notwithstanding that there are aspects of Plaintiff's employment that point to classifying Plaintiff as an independent contractor, Defendant is not entitled to judgment as a matter of law because there is enough evidence in the record to create a triable issue of fact on the issue of Plaintiff's status as an employee. Specifically, Plaintiff has presented evidence that Defendant trained her, set her schedule, dictated where she would work on a given day, supervised her, and took disciplinary action against her. (Dkt. Nos. 58-14; 58-3 at 4, 8-9; 58-4 at 4, 6, 16, 21-22; 58-19 at 2). Plaintiff also presented evidence that Defendant provided Plaintiff with a uniform shirt and materials to distribute to tourists. In view of the preeminent role that the degree of control exercised by the employer plays in the employee/independent contractor analysis, the Court concludes that Plaintiff has presented evidence from which a jury could rationally find that she was, in fact, an employee and not an independent contractor. Because Plaintiff has established that there are genuine issues of material fact on the employee/independent contractor issue, summary judgment is inappropriate.

### B.      Hostile Work Environment

Under Title VII, it is an unlawful employment practice for an employer to "discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). Within that

context, Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment," *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986), also known as a "hostile work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 18-19 (1993). In order to succeed on a Title VII claim for a hostile work environment based on sexual harassment, a plaintiff must prove that:

> (1) [she] suffered intentional discrimination because of [her] sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability.

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). "The first four elements of this claim establish that a hostile work environment existed. The fifth element . . . establishes the basis on which to hold the employer liable." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

The "severe or pervasive element" includes "both an objective and subjective inquiry." *Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 777 n.5 (3d Cir. 2009); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (plaintiff must prove that the workplace was "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."). As a result, this second element "substantially overlaps with the third and fourth elements of this Circuit's hostile work environment claim." *Brooks*, 342 F. App'x at 777 n.5; *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006), *overruled in part on other grounds* by *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53 (2006) ("When applied, [the second and fourth prongs] coalesce into a single inquiry: did the plaintiff suffer . . . harassment severe or pervasive enough to alter the conditions of her employment and create an abusive working environment?") (internal quotation marks and citations omitted).

The Third Circuit has instructed that:

14

> the need for an objectively abusive work environment further distinguishes Title VII from a generalized 'civility code.' The statute prohibits severe or pervasive harassment; it does not mandate a happy workplace. Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of plaintiff's employment.

*Jensen*, 435 F.3d at 451 (citation omitted); *see also Faragher*, 524 U.S. at 783 ("The standard for judging harassment is sufficiently demanding to ensure that Title VII does not become a general civility code."); *Clegg v. Falcon Plastics,* 174 F. App'x 18, 23 (3d Cir. 2006) ("Not all workplace conduct that may be described as harassment, however, rises to the level of a hostile work environment."). In other words, Title VII does not permit a court to police the workplace to punish every untoward comment or action by one employee against another. Only those that are so objectively offensive that they "alter the conditions of [the plaintiff's] employment and create an abusive working environment" are actionable. *Meritor Sav. Bank,* 477 U.S. at 67. Detracting from an employee's job performance, discouraging employees from remaining on the job, and keeping them from advancing in their careers are examples of situations where the conditions of employment are altered. *Harris*, 510 U.S. at 22.

Defendant contends that it is entitled to summary judgment because Plaintiff cannot, as a matter of law, prove each of the elements necessary to establish her claim of sexual harassment. The Court will address each element in turn.

### 1.  Intentional Sex Discrimination

"Title VII protects only against harassment based on discrimination against a protected class; it is not 'a general civility code for the American workplace.'" *Mufti v. Aarsand & Co.*, 667 F. Supp. 2d 535, 544 (W.D. Pa. 2009) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998)). Therefore, at the summary judgment stage, "[t]he proper inquiry . . . [is] whether a reasonable factfinder could view the evidence as showing that . . . [the plaintiff's]

treatment was attributable to [his or her protected status]." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 277 (3d Cir. 2001). A plaintiff may satisfy his or her burden with respect to the first element of a hostile work environment claim if he or she presents "sufficient evidence to give rise to an inference of discrimination[.]" *Abramson*, 260 F.3d at 278-79.

Here, Defendant makes a blanket statement that "Plaintiff has not adduced one scintilla of evidence to establish a nexus between the alleged incidents and her gender, the absence of which is fatal to her Title VII claim." (Dkt. No. 65 at 11). Although the moving party has the burden to support its assertion, Defendant did not elaborate beyond this bald statement. Plaintiff's allegations and the evidence that she presented of sex-based mistreatment are rather straightforward—she was propositioned for sex by her supervisor Alvin Milligan on several occasions. *See Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexually derogatory language is implicit[.]"). Accordingly, on the record, summary judgment for Defendant is improper as to this element.

### 2. Severe or Pervasive Discrimination

Whether a work environment is considered severe or pervasive so as to support a Title VII sexual harassment claim is to be measured by the totality of the circumstances. *Harris*, 510 U.S. at 23. Courts consider a variety of factors when assessing whether an environment is hostile or abusive, such as: (1) the frequency and severity of the discriminatory conduct; (2) whether such conduct is physically threatening or humiliating or merely an offensive utterance; and (3) whether the conduct unreasonably interferes with the plaintiff's work performance. *See id.; Faragher*, 524 U.S. at 787-88.

"Discrimination is pervasive where the 'incidents of harassment occur either in concert or with regularity.'" *Trunzo v. Ass'n of Property Owners of the Hideout, Inc.*, 90 F. App'x 622, 625 (3d Cir. 2004) (quoting *Andrews*, 895 F.2d at 1484); *see also Faragher*, 524 U.S. at 787 n.1 (sexual harassment "must be more than episodic; [it] must be sufficiently continuous and concerted[.]") (quotation omitted)). With regard to severity, the Supreme Court has observed that "conduct must be extreme to amount to a change in the terms and conditions of employment[.]" *Faragher,* 524 U.S. at 788. "No 'magic threshold' exists as to a number of required incidents, and frequency must be balanced against other factors, such as 'its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.'" *Clark v. Acme Markets, Inc.,* 2014 WL 714898, at *6 (D.N.J. Feb. 24, 2014) (quoting *Faragher*, 524 U.S. at 787-88); *see also West v. PECO*, 45 F.3d 744, 757 (3d Cir. 1995) ("frequency . . . is to be considered in context, including the severity of the incidents.").

Plaintiff has come forward with evidence that, while employed by Defendant, (1) Milligan asked her to spend time with him; (2) Milligan sent a text message stating, "I want to sit on your face;" (3) Milligan began asking for sex three or four times per week beginning in September 2013; (4) Milligan offered her money for sex; and (5) on one occasion in November 2013, drew a dollar sign on a piece of paper, circled the dollar sign, and wrote "no strings," before verbally asking Plaintiff for sex again. Further, Plaintiff testified that she rejected Milligan's advances on numerous occasions (more than ten) and that she was not interested in any kind of intimate relationship with him. (Dkt. No. 58-1 at 7).

Without discussing the evidence presented, Defendant makes only the blanket, conclusory statement that "[e]ven if the alleged harassing conduct occurred, at best it was inappropriate, but

not sufficiently severe or pervasive." (Dkt. No. 65 at 12). However, viewed in the light most favorable to Plaintiff, there is evidence to suggest that almost immediately after Plaintiff began working at Tourism, Milligan—to whom she reported directly—was frequently interacting with her in a sexually-charged manner. Based on this evidence, a factfinder could rationally conclude that Milligan was pressuring Plaintiff to engage in a sexual relationship with him and subjected her to a series of frequent and persistent sexual advances. Such conduct creates triable issues of fact with regard to the pervasiveness and severity of the conduct necessary to establish a claim of sexual harassment. *See, e.g., Huizar v. Leprino Foods*, 2011 WL 1002019, at *5 (D. Colo. Mar. 18, 2011) (denying summary judgment where plaintiff represented that her supervisor "frequently propositioned her for sex"); *EEOC v. Caterpillar Inc.*, 503 F. Supp. 2d 995, 1008 (N.D. Ill. 2007) (denying summary judgment where supervisor had asked plaintiff to have sex seven different times within a six-day period). Thus, summary judgment is improper as to this element.

### 3. Unwelcome/Detrimental Effect

To succeed on a claim of sexual harassment, the conduct at issue must be unwelcome in that the plaintiff neither solicited nor invited it and regarded the conduct as undesirable or offensive. *See Meritor*, 477 U.S. 57, 68 (1986). The court may consider whether the plaintiff participated in the very conduct of which she complains. Where a plaintiff's action in the workplace shows that she was a willing and frequent participant in the conduct at issue, courts are less likely to find that the conduct was unwelcome or hostile. *See, e.g., Reed v. Shepard,* 939 F.2d 484 (7th Cir.1991) (rejecting hostile environment claim where plaintiff instigated and participated in sexual horseplay and had one of the foulest mouths in the department); *Hicks v. Baltimore Gas*, 829 F. Supp. 791, 796 (D. Md. 1992), *aff'd*, 998 F.2d 1009 (4th Cir. 1993) (male co-workers' actions in calling plaintiff names and posting sexually-oriented cartoons with one cartoon

containing derogatory comments and her name were insufficient to establish harassment when plaintiff admitted calling co-workers names; she subjected co-workers to offensive language; and her own behavior was erratic and angry). However, a plaintiff's participation in the offensive conduct complained of may not forever bar a hostile work environment claim where the plaintiff, at some point, makes clear that in the future such conduct will be deemed unwelcome and the conduct continues thereafter. *See, e.g., Weinshemer v. Rockwell International Corp.*, 754 F. Supp. 1559, 1564 n.12 (M.D. Fla. 1990) (harassment unwelcome when plaintiff, at some point, "clearly made her co-workers and superiors aware that in the future such conduct would be considered 'unwelcome.'"); *Loftin-Boggs,* 633 F. Supp. at 1327 n. 8 (S.D. Miss. 1986) (when a plaintiff has participated in office harassment, to establish a hostile environment claim, she "must be able to identify with some precision a point at which she made known to her co-workers or superiors that such conduct would henceforth be considered offensive."). "With regard to the [detrimental effect] element, while a plaintiff need not establish a tangible psychological injury, she must, at the very least, subjectively perceive the environment to be abusive." *Cagnetti v. Juniper Vill. at Bensalem Operations*, 2020 WL 4039027, at *8 (E.D. Pa. July 17, 2020) (internal citations omitted) (plaintiff had demonstrated "a detrimental effect from the discriminatory activity" when she was "'bothered enough' by [her co-worker's] conduct to report him").

The harassment evidence discussed previously, together with Plaintiff's testimony that she repeatedly rebuffed the advances, is evidence that the conduct was unwelcome and had a detrimental effect, both subjectively and objectively. However, according to Defendant, Plaintiff did not consider Milligan's alleged conduct to be unwelcome, because she referred to Milligan as "hon" and never expressed that she was uncomfortable with him. (Dkt. No. 65 at 10 (quoting Dkt. No. 58-3 at 47)). Defendant also argues that "Plaintiff has not produced any evidence, except for

19

her unsupported allegations that the conduct complained of was unwelcomed." (Dkt. No. 68 at 5).[6] Further, Defendant relies on Haynes' deposition in which Haynes testified that he believed Plaintiff enjoyed the attention Milligan gave to her and that she was not offended by it.  (Dkt. No. 65 at 11 (quoting Dkt. No. 58-6 at 6, 10-11)).

Plaintiff argues that "Milligan's harassment detrimentally affected [her] as his behavior made her uncomfortable, annoyed, disgusted and appalled and she never wanted to be near him." (Dkt. No. 66 at 17). Plaintiff further states that "any reasonable woman would be detrimentally affected in [her] position of being constantly sexually harassed and then called a whore and being accused of 'f**king everybody and a whore' in retaliation for refusing [Milligan's] advances." (Dkt. No. 66 at 17). Plaintiff testified that she was depressed, embarrassed, and stressed as a result of Milligan's advances. (Dkt. No. 58-1 at 12). Defendant does not directly address these arguments, but instead reasserts that Plaintiff welcomed Milligan's advances. (Dkt. No. 65 at 11-12; 68 at 5-6).

There is evidence in the record that Plaintiff referred to Milligan as "hon" at least once and that she invited him to her daughter's birthday party *after* some of the alleged harassment occurred—the latter action which she explained as something she believed was expected of all employees. (Dkt. No. 58-1 at 4). However, the alleged reference to Milligan as "hon" and the invitation to Plaintiff's daughter's party cannot be considered in isolation, but only together with all the other evidence. For example, in *Clegg*, a panel of the Third Circuit found that a plaintiff's email to an alleged harasser requesting that he "talk dirty" to her did not prove as a matter of law

---

[6] To this end, Defendant refers to Exhibit 28, which is a two-page excerpt from Nicholson-Doty's deposition. In this excerpt, Nicholson-Doty answers questions only related to Defendant's sexual harassment policies—not anything specific about Plaintiff's allegations regarding Milligan's conduct, including whether Plaintiff deemed it unwelcome.

that she invited the harassment that ultimately followed. 174 F. App'x at 25 n.7. Rather, because the plaintiff maintained that the purpose of that email had been to make a joke, the court held that her email may *raise a question*, to be resolved by a jury, about whether the conduct was unwelcome. *Id.*

Similarly, here, the Court does not find, as a matter of law, that Plaintiff cannot establish that Milligan's alleged conduct was unwelcome. When considered in the totality of the circumstances and viewing the evidence in the light most favorable to Plaintiff, the alleged reference to Milligan as "hon," and the invitation to the birthday party are not such obvious indicators of welcomeness that no reasonable juror could find in favor of Plaintiff. *See E.E.O.C. v. Management Hospitality of Racine, Inc.*, 780 F. Supp. 2d 802, 811 (E.D. Wis. 2010) (jury reasonably concluded that female employee found male supervisor's harassment unwelcome, despite her testimony that she was "flattered" when supervisor made comment about liking her tie and haircut); *Smith v. Cnty. of Culpeper,* 1998 WL 964501, at *4 (W.D. Va. Dec. 23, 1998), *aff'd,* 191 F.3d 448 (4th Cir. 1999) ("Plaintiff's own participation in sexually suggestive behavior is relevant in determining the totality of the circumstances, but is not, in and of itself, determinative."). Rather, the evidence in support of Defendant's position raises a question for the jury as to whether Plaintiff construed Milligan's alleged conduct to be unwelcome.

Additionally, Plaintiff's habitual rejections of Milligan's alleged advances make her claims distinguishable from those in cases where courts have found plaintiffs to be welcoming of sexual advances in the workplace. *See, e.g., Miles v. City of Birmingham*, 398 F. Supp. 3d 1163, 1179 (N.D. Ala. 2019) (female plaintiff's own testimony confirmed two-year relationship with male supervisor; she willingly engaged in sexual relationship with him without telling him to stop; she slept over at his apartment on multiple occasions and told him that she loved him; and she gave

him the key to her apartment); *Loftin-Biggs*, 633 F. Supp. at 1327 ("Considering plaintiff's contribution to and apparent enjoyment of the situation, it cannot be said that the defendants created 'an intimidating, hostile, or offensive working environment.'"); *Reichman v. Bureau of Affirmative Action*, 536 F. Supp. 1149, 1177 (M.D. Pa. 1982) (male supervisor's sexual advances to female plaintiff were not unwelcome where plaintiff acted in "a very flirtatious and provocative manner" and invited him "to have dinner at her house on several occasions").

A trier of facts could rationally believe Plaintiff's view of Milligan's actions even if Milligan—and other witnesses at trial—might have a different view. It is precisely such circumstances that create triable issues of fact for the jury. Because the jury could reasonably conclude that Milligan's harassment of Plaintiff was unwelcome and had a detrimental effect, the Court cannot find, as a matter of law, that Plaintiff would be unable to prove these elements of her sexual harassment claim.

### 4. Respondeat Superior Liability

Even if Plaintiff could satisfy the other elements of a hostile work environment claim, Defendant maintains that it is still entitled to summary judgment because Defendant behaved reasonably, and Plaintiff unreasonably, with regard to addressing the alleged harassment, and thus, there is no respondeat superior liability. (Dkt. No. 65 at 12-14).

In general, "an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). However, the Supreme Court has established that "a defending employer may raise an affirmative defense to liability or damage . . . [if] the supervisor's harassment [does not] culminate[] in a

tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth,* 524 U.S. at 765; *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998).

To avail itself of the *Faragher-Ellerth* affirmative defense, the employer must show "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 310 (3d Cir. 2018) (quoting *Faragher*, 524 U.S. at 807). Defendant bears the burden of proving both elements of the defense by a preponderance of the evidence. *See Pennsylvania State Police v. Suders,* 542 U.S. 129, 146 (2004); *see also Faragher,* 524 U.S. at 807-08.

"The cornerstone of this analysis is reasonableness: the reasonableness of the employer's preventative and corrective measures, and the reasonableness of the employee's efforts (or lack thereof) to report misconduct and avoid further harm." *Minarsky*, 895 F.3d at 311. For example, "[t]he existence of a functioning anti-harassment policy *could* prove the employer's exercise of reasonable care so as to satisfy the first element of the affirmative defense." *Id.* (citing *Faragher*, 524 U.S. at 807). However, "merely possessing a written sexual harassment policy is insufficient to demonstrate reasonable care in preventing sexual harassment; the written policy must also be reasonably promulgated." *Hill v. Children's Vill.*, 196 F. Supp. 2d 389, 399 (S.D.N.Y. 2002). Summary judgment should be denied on the first prong where "a genuine issue of fact exists as to whether [the employer's policy] had force." *Mills v. George R. Funaro & Co.*, 2001 WL 50893, at *11 (S.D.N.Y. Jan. 19, 2001).

To prove the second element of the affirmative defense—that the plaintiff unreasonably failed to avail herself of the employer's "preventive or corrective opportunities"—the Supreme

Court has held that "proof that an employee failed to [exercise] reasonable care to avoid harm . . . will normally suffice to satisfy the employer's burden . . . ." *Minarsky*, 895 F.3d at 311 (quoting *Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 765). According to Defendant, *Faragher-Ellerth* entitles it to summary judgment on Plaintiff's Title VII claim based on a hostile work environment. (Dkt. No. 65 at 12-14).

### i.       Availability of *Faragher-Ellerth* Defense

Because Milligan was Plaintiff's supervisor,  Defendant is strictly liable for the creation of a hostile work environment if the conduct of Milligan culminated in a tangible employment action. *Vance v. Ball State Univ.,* 570 U.S. 421, 467 (2013) (citing *Faragher,* 524 U.S. at 807; *Ellerth,* 524 U.S. at 765). Defendant proceeds to its *Faragher-Ellerth* argument without addressing whether this case involves a tangible employment action. Plaintiff, however, argues that *Faragher-Ellerth* does not apply, "as there is sufficient evidence that she was wrongly suspended and terminated as a result of his harassment." (Dkt. No. 66 at 19 n.2). For the reasons stated below, the Court finds that Plaintiff has raised genuine issues of material fact as to whether she suffered a tangible employment action. Accordingly, summary judgment is not appropriate on the issue of respondeat superior.

A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance,* 570 U.S. at 431 (quoting *Ellerth,* 524 U.S. at 761). Economic injury is almost always sufficient to create a tangible employment action. *Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 738 (10th Cir. 2014). However, it is not always necessary. *See id.* (citing *Ellerth,* 524 U.S. at 762) ("A tangible employment action *in most cases* inflicts direct economic harm.") (emphasis in *Kramer*). As this Court has explained:

> [A] tangible employment action can include not just the obvious firing or demoting, but also giving an employee a less distinguished title [or actions resulting in] a material loss of benefits, significantly diminished material responsibilities, or other indicies that might be unique to a particular situation. However, neither a bruised ego nor a demotion *without* a concurring change in pay, benefits, duties, or prestige is enough.

*Kantz v. Univ. of the V.I.*, 2016 WL 2997115, at *18 (D.V.I. May 19, 2016) (citing *Kramer*, 743 F.3d at 738-39).

Almost by definition, Plaintiff's suspension and termination were actions that adversely affected her "pay, benefits, duties, or prestige." *Kramer,* 743 F.3d at 739; *see also Faragher*, 524 U.S. at 808 ("discharge, demotion, or undesirable reassignment" constitute some types of tangible employment actions); *Byrd v. Ill. Dept. of Public* Health, 423 F.3d 696, 709 (7th Cir. 2005) (suspension is tangible employment action); *Baer-Burwell v. City of Peoria, Ill.*, 2012 WL 5198342, at *18 (C.D. Ill. Oct. 19, 2012) ("A three-day suspension is a tangible employment action[.]").

In order to prevent a defendant from raising the *Faragher-Ellerth* defense*,* "[a] plaintiff [must] show that the tangible employment action was *related* to the alleged unlawful harassment or retaliation." *Cacciola v. Work N Gear,* 23 F. Supp. 3d 518, 531 (E.D. Pa. 2014) (emphasis added). In that regard, for the same reasons that the Court concludes below that there are genuine issues of material fact as to Plaintiff's retaliation claim, the Court concludes here that there are genuine issues of material fact regarding the relationship between the suspension and termination and the alleged harassment that precludes summary judgment on the tangible employment action issue for purposes of the availability of the *Faragher-Ellerth* affirmative defense. *See* Section III.C, *infra*.

Based on the foregoing, the Court finds that Plaintiff has presented sufficient evidence to create genuine issues of material fact as to whether she suffered a tangible employment action, and thus whether Defendant is strictly liable for the alleged sexual harassment

### ii.   Affirmative Defense

Absent a tangible employment action, a defendant may seek to avail itself of the *Faragher-Ellerth* affirmative defense to liability for the existence of a hostile work environment. *See Vance,* 133 S. Ct. at 2439 (citing *Faragher,* 524 U.S. at 807; *Ellerth,* 524 U.S. at 765). Defendant maintains that it is entitled to summary judgment on Plaintiff's Title VII claim because of the applicability of this defense.

In analyzing the first prong of the *Faragher-Ellerth* defense—whether the employer "exercised reasonable care to prevent and correct promptly any . . . harassing behavior," *Ellerth*, 524 U.S. at 765, circumstances may be such that the focus of the analysis is on whether the remedial action taken by the employer was adequate. *See Knabe v. Boury Corp.*, 114 F.3d 407, 412-13 (3d Cir. 1997) ("The question before us is not whether the investigation was adequate—it appears not to have been—but rather whether remedial action was adequate . . . [W]e must consider whether the action was reasonably calculated to prevent further harassment.") (internal citations omitted). In other instances,

> there may be cases in which an employer's investigation is so flawed that it could not be said that the remedial action was adequate. For example, the investigation might be carried out in a way that prevents the discovery of serious and significant harassment by an employee such that the remedy chosen by the employer could not be held to be reasonably calculated to prevent the harassment.

*Id.* at 414.

According to Defendant, its response was adequate, because (1) Defendant launched an investigation on December 2, 2013, just one week after Plaintiff's complaint to Nugent; (2) the

investigation was comprehensive in that Hodge interviewed Plaintiff, Milligan, and other greeters; and (3) the investigation was productive in that it led to Nicholson-Doty asking Nugent to be more involved in office operations. (Dkt. No. 65 at 13-14).

In response, Plaintiff argues that Defendant's efforts to remedy the alleged harassment were insufficient. Plaintiff argues that: (1) Harris "was aware of the sexual harassment of Plaintiff and multiple other employees, but failed to report it as she is close friends with Milligan"; (2) Hodge's investigation was flawed and ran afoul of EEOC guidance, as Defendant failed to document all statements from those who were interviewed and did not have all of the witnesses sign confidentiality agreements; (3) Hodge failed to follow EEOC directives by not more heavily weighing the statements of Plaintiff's co-workers; and (4) Defendant took no action against Milligan, even though Hodge's final report actually confirmed some of Plaintiff's allegations regarding the harassment. (Dkt. No. 66 at 14-15, 20).

As an initial matter, there are questions of fact regarding whether and when Harris should have taken action after Plaintiff spoke to her about the alleged harassment. Plaintiff states that she spoke to Harris "during the summer of 2013." (Dkt. No. 67 at 18). Defendant seems to claim that Harris fulfilled her responsibilities by advising Plaintiff to report the harassment to Nugent. (Dkt. No. 67 at 19). Plaintiff argues, however, that Harris had a responsibility under Defendant's sexual harassment policy to herself "act on the complaint immediately." (*See* Dkt. No. 67 at 19).

Defendant's sexual harassment policy states:

> Any supervisor, agency head or director made aware of any report or complaint of sexual harassment, or of any unlawful adverse employment action relating to filing a sexual harassment complaint, must act on the complaint immediately.

(Dkt. No. 58-7 at 1). It is a triable issue of fact for the jury to decide whether, under the language of this policy, Harris was a "supervisor" whose failure to take immediate redressive action could

be imputed to Defendant. (Dkt. Nos. 58-2 at ¶ 10; 58-4 at 4, 6); *see Gallagher v. C.H. Robinson Worldwide*, 567 F.3d 263, 275 (6th Cir. 2009) ("An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized—or is reasonably believed by a complaining employee to have been authorized—to receive and respond to or forward such complaints to management."). Harris testified that she was disgusted by the picture of the dollar sign that Milligan allegedly drew and advised Plaintiff to contact Nugent to make a formal complaint. (Dkt. No. 52-13). Harris further testified: "Melba is an adult, and I told Melba if it's offending her, she can go ahead and report it[]" and to "[d]o what you have to do." (Dkt. No. 58-4 at 7-8). If the jury were to decide that Harris was a supervisor who had the responsibility to act upon a complaint of sexual harassment, there would be a triable issue of fact as to whether Harris' response was sufficient. *See Hill*, 196 F. Supp. 2d at 399 (issue of fact remained as to whether employer adequately implemented its own sexual harassment policy, when supervisor who had duty to report complaints never did so).

The Court also finds that there are genuine issues of material fact as to the adequacy of the remedial action stemming from the investigative/decision-making process.[7] Based on the record, the Court agrees that following Plaintiff's complaint to Nugent, the matter was promptly communicated to Nicholson-Doty and referred for investigation. The Court also agrees that the investigation was conducted promptly. However, in addition to the shift in focus of the investigation from the allegations of sexual harassment against Milligan to the seemingly separate issue of Nugent's management style—with the corresponding focus on recommendations to address low employee morale and lack of confidence in management—there are issues as to

---

[7] As noted earlier, Hodge recommended annual sexual harassment training and the inclusion of such training in the orientation of Welcome Greeters.

whether Nicholson-Doty was fully apprised of the investigative record when making her decision regarding remedial action. Nicholson-Doty testified that she recalled receiving only "something that was like an overview that basically said [the investigation] was inconclusive." (Dkt. No. 58-17 at 12). One is thus left to wonder whether the decisionmaker was aware, *inter alia*, that several of Plaintiff's allegations of sexual harassment by Milligan were noted by Hodge as supported by witness statements. The significance of this is apparent given that Nicholson-Doty responded in the affirmative at her deposition when asked whether she would consider Milligan's alleged actions toward Haynes and Heywood to be sexual harassment. *Id.* at 2. Under the circumstances, there are issues of fact as to the adequacy of the remedial action.

For all of the foregoing reasons, the Court will deny Defendant's Motion grounded in the argument that Plaintiff cannot establish—as a matter of law—the existence of respondeat superior liability.[8]

## C.    Retaliation

Plaintiff's retaliation claims must be analyzed under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a *prima facie* case of retaliation under Title VII, Plaintiff must show that: "'(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Moore v. City of Phila.,* 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir. 1995)). If successful in demonstrating a prima

---

[8] Because the Court has concluded that Defendant failed to satisfy its burden of proving the first element of the *Faragher-Ellerth* defense, the Court need not reach the second element. *See Kantz*, 2016 WL 2997115, at *19 n.28 (holding the same).

facie case of retaliation, the burden then shifts to Defendant to articulate a legitimate non-retaliatory reason for taking the adverse employment action against Plaintiff. *See McDonnell Douglas*, 411 U.S. at 802; *Moore*, 461 F.3d at 342. Once a defendant establishes a non-discriminatory reason for its action, summary judgment is warranted unless the plaintiff is able to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tomasso v. Boeing Co.,* 445 F.3d 702, 706 (3d Cir. 2006). Doing so requires a plaintiff to not just show the defendant was "wrong or mistaken" in terminating her employment, but to also "present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its actions." *Id.* In other words, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's legitimate non-discriminatory reasons "that a reasonable factfinder could rationally find them 'unworthy of credence,'" and thus infer that the legitimate reasons were not the basis for the defendant's actions. *Id.*

Plaintiff claims that Defendant suspended and terminated her in retaliation for two different forms of protected activity—her informal discussion with Harris and her internal complaint to Nugent. (Dkt. No. 66 at 24). Defendant seeks summary judgment on the ground that it can point to legitimate, non-retaliatory reasons for its employment decisions—Plaintiff's tardiness, absenteeism, and unprofessionalism. (Dkt. No. 65 at 15-16).[9] Defendant states that "[d]espite verbal and written counseling, Plaintiff's behavior did not improve." (Dkt. No. 65 at 15). Further,

---

[9] Defendant also argues that because Plaintiff was an independent contractor and not an employee, a Title VII retaliation claim cannot be brought. (Dkt. No. 65 at 15). The Court has already concluded that Defendant is not entitled to summary judgment on the issue of Plaintiff's employment status.

Defendant characterizes the altercation with Harris—based on the deposition testimony of Nicholson-Doty—as an example of behavior that was "unprofessional in a public space where the Government's primary objective was to welcome visitors." (Dkt. No. 65 at 15-16). As stated by Nicholson-Doty in her deposition:

> [T]he key elements of that decision was being absent from work. Being tardy to work. And then being unprofessional in a public space where our primary objective is to welcome visitors. Those were the guiding concerns that led to my decision.

(Dkt. No. 58-17 at 33). Finally, Defendant argues that Plaintiff's contract was not terminated; rather, it simply was not renewed, which Tourism had the authority to do. (Dkt. No. 65 at 16).

Plaintiff contends that she can show that her suspension and termination were actually in retaliation for her complaint to Nugent and that the purported reasons for her suspension and termination—tardiness, absenteeism, and the incident at the airport office—were overstated in an attempt to cover up Milligan's desire to seek revenge and Harris' assistance in helping him do so. To this end, Plaintiff claims that Milligan made false complaints about her that ultimately led to her suspension and termination. (Dkt. No. 66 at 24-25). Further, Plaintiff states that it was Harris—not she—who initiated the verbal and physical altercation at the airport office and then filed a police report against Plaintiff, leading to her termination. (Dkt. No. 66 at 24-25).

The undisputed facts establish that Plaintiff had problems with tardiness and absenteeism prior to being suspended. Plaintiff admitted as much in her deposition. (Dkt. No. 58-1 at 5). But there are questions of fact regarding the frequency of Plaintiff's attendance problems and whether they continued after Plaintiff's complaint to Nugent. Documentation dated September 25, 2013, October 11, 2013,  and November 26, 2013 (Dkt. Nos. 52-29 at 1-2; 58-14) all refer to instances of Plaintiff's tardiness and absenteeism that occurred *before* Plaintiff's complaint to Nugent.

Although Defendant makes passing references to other instances in which Plaintiff was late or absent from work, Defendant neither states when they occurred nor provides factual support therefor. Although Plaintiff admits to being late for work "about three times," she testified that Milligan only began issuing reprimands after she complained about his conduct. (Dkt. No. 58-19 at ¶ 7). Further, Milligan admitted that as soon as he stopped supervising Plaintiff in December 2013, nobody other than Harris expressed any concerns with Plaintiff's work or attendance. (Dkt. No. 58-3 at 11). Finally, Harris's testimony also revealed that Plaintiff's attendance issues, although not perfect, were improving. (Dkt. No. 58-4 at 11).

With this evidence, a jury could rationally infer retaliatory animus from Defendant's decision to suspend and terminate Plaintiff. There is evidence challenging the timing of the reprimands for Plaintiff's attendance problems in relation to her complaint to Nugent and her subsequent termination. There also is evidence showing that Plaintiff's attendance was improving rather than deteriorating. *See, e.g., Blincow v. MillerCoors, LLC*, 2018 WL 3869162, at * 4 (E.D. Cal. Aug. 15, 2018) (firing employee just one month into performance improvement plan, where employee's performance was significantly improving and he was otherwise on track to achieve the plan's objectives, raised a genuine issue whether firing was motivated by retaliation). Such evidence creates triable issues of fact regarding the legitimacy of Plaintiff's attendance as a basis for the suspension and termination.

The circumstances surrounding the altercation at the airport—the other alleged basis for Plaintiff's termination—also creates genuine issues of material fact. Plaintiff states that Harris was unprovoked in her attempt "to start a big commotion as to why the VIPA employee had been in the office." (Dkt. No. 58-2 at ¶ 28). Further, Plaintiff states in her affidavit that:

> Ms. Harris, who is a pro Milligan employee, then began to waive her hands in my face and I ignored her. I got up to diffuse the situation and commented that the

> whole thing was a friggin waste of time. She then responded, "No, you are a friggin waste" and went to put her hands in my face again and her hand went into my mouth. I was escorted out of the office by my co-worker. I reported the incident to Brad Nugent and the VIPA police. Despite the fact that it was Ms. Harris who had instigated the matter and who had improperly touched me, I was suspended and she was not.

*Id.* at ¶¶ 28-29. Harris does not remember if Plaintiff touched her, but she did admit to shoving her hands in Plaintiff's face and pushing Plaintiff back after she felt that Plaintiff had invaded her "personal space." (Dkt. No. 58-4 at 16). Harris also acknowledged that she, unlike Plaintiff, was not counseled or disciplined after the altercation. *Id.* While Defendant investigated the altercation, Nicholson-Doty testified that she had limited memory of what occurred:

> The understanding that I had was that there were individuals that should not have been in the office storeroom where we keep the Tourism supplies. And that—there was a yelling match between [Harris and Moore]. That Ms. Moore was aggressive. That Ms. Harris felt that Ms. Moore had compromised the department's area that she's ultimately, or we're ultimately responsible for, supplies and resources. In all honesty, that's about all I recall at this point.

(Dkt. No. 58-17 at 24).

Defendant's decision to suspend and then terminate Plaintiff, which was partially based on the airport incident, appears to rest on the version of the events offered by Harris. There apparently are two conflicting versions of events as to what occurred between Plaintiff and Harris at the airport office. Viewing the evidence in the light most favorable to Plaintiff, it would not be unreasonable for a jury to believe that Harris instigated the commotion at the airport office, based on Plaintiff's assertions regarding Harris' motives. It would also not be unreasonable for a jury to find—as Plaintiff claims—that Milligan's e-mail to Nugent the day after the incident[10] was written in an

---

[10] In the email, Milligan wrote:

> I know by now you have heard about the situation with Melba and Kisa last evening. Frankly, now I am being targeted and threats are being sent. I have made a 911 call to come to the office to make again another police report. This matter has gone way

attempt to make Plaintiff look as if she was the initial aggressor in the altercation.

In view of the foregoing, the Court concludes that there are sufficient disputed facts that a reasonable jury could conclude that Defendant's stated reasons for Plaintiff's suspension and termination were pretextual. Accordingly, the Court finds that these genuine issues of material fact preclude summary judgment on Plaintiff's retaliation claims.

### D.    Alleged Discrimination Under Virgin Islands Law

The only argument put forward by Defendant in support of summary judgment on Plaintiff's claims under the Virgin Islands Civil Rights Act (VICRA) is that she was not an employee. (Dkt. Nos. 65 at 16; 68 at 6). VICRA dictates that "the term employee must be interpreted in the broadest sense possible." 10 V.I.C. § 64a. This statutory command suggests that the term "employee" should be read at least as broadly as it is read under federal law. Therefore, for the same reasons articulated in Section III.A, *supra*, Defendant's contention that Plaintiff is not an employee as a matter of law fails.

### E.    Duty of Good Faith and Fair Dealing

Under Virgin Islands law, "the implied duty of good faith and fair dealing arises by implication through the existence of a contract itself." *Chapman v. Cornwall*, 2013 WL 2145092, at *5 (citing Restatement (Second) of Contracts § 205). The duty of good faith "limits the parties' ability to act unreasonably in contravention of the other party's reasonable expectations." *Id*. (quoting *Pennick v. V.I. Behavioral Serv., Inc.*, 2012 WL 593137, at *3 (D.V.I. App. Div. Feb. 22, 2012)); *see also Mendez v. Coastal Systems Dev., Inc.*, 2008 WL 2149373, *4 (D.V.I. May 20, 2008) (covenant of good faith and fair dealing in employment serves to protect the integrity of the

---

too far. Now we are being threatened? What next?

(Dkt. No. 58-23).

promises made by the parties pertaining to the terms and conditions of employment).

In the Virgin Islands, a claim of breach of good faith and fair dealing "may lie in an employment relationship if the plaintiff brings forward proof that the employer: (1) acted unreasonably in contravention of his expectations; and (2) took actions amounting to fraud or deceit." *Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 201 (3d Cir. 2014) (internal quotations and punctuation omitted); *see also Benjamin v. Government of Virgin Islands*, 2020 WL 1426691, at *5 (V.I. Super. Ct. Mar. 16, 2020) (successful claim of breach of duty of good faith and fair dealing "requires proof of acts amounting to fraud or deceit on the part of the employer.")

To successfully bring a claim for breach of the duty of good faith and fair dealing, the plaintiff must show that a party "take[s] action that deprives another party of the benefits for which it had bargained." *Gardiner v. St. Croix District Governing Bd. Of Dir.*, 2019 WL 38114427, at *4 (V.I. Sup. Ct. July 30, 2019). In the employment context, however, "courts have recognized that a tension exists between [the implied covenant of good faith and fair dealing and at-will employment] doctrines insofar as the implied covenant imposes a duty of good faith and fair dealing on an employer who intended to retain total discretion over his or her employment relationships." Accordingly, "the covenant of good faith and fair dealing should not be viewed too broadly, for the risk is that it may be misapplied." *Bethea v. Merchants Comm. Bank*, 2014 WL 4413045, at *15 (D.V.I. Sept. 8, 2014).

To support her claim, Plaintiff relies mostly on the same allegations used to support her employment discrimination claims, specifically that: (1) "Milligan fraudulently discredited [her] by claiming she was 'f**king' Nugent and that [she] and Nugent were conspiring against him;" (2) Harris falsely told Hodge that Nugent was sexually propositioned by Plaintiff; (3) Hodge and

Nicholson-Doty changed the focus of the investigation towards Nugent, "completely marginalizing Plaintiff's complaints;" (4) Milligan made false written accusations that Plaintiff was tardy for work; (5) Milligan threatened Plaintiff's co-workers in advance of the investigation; and (6) Milligan sent a false email to Nicholson-Doty stating that Plaintiff was threatening him. (Dkt. No. 66 at 28-29). These actions—Plaintiff argues—"violated what Plaintiff reasonably expected from her employment with Defendant by being expected to turn a blind eye to oppressive sexual harassment in the workplace." (Dkt. No. 66 at 30).

As a preliminary matter, Plaintiff points to no fraudulent or deceitful conduct or contractual source from which the alleged broken promises are derived. *See Neff v. PKS Holdings, LLC*, 2019 WL 3729568 at *13 (E.D. Pa. Aug. 8, 2019) (dismissing claim where the plaintiff "fail[ed] to point to a contractual term that existed beyond the at-will employment relationship."). Nor has Plaintiff cited to any facts that establish that Defendant engaged in acts amounting to fraud or deceit. Simply inserting the word "false" or "fraudulent" in front of Plaintiff's various allegations does not satisfy the elements for a claim of fraud—which must be pled with particularity. *See Bank of Nova Scotia v. Boynes*, 2016 WL 6268827, at *1 (V.I. Super. Oct. 18, 2016).

Here, the Court understands Plaintiff to be making a generalized claim that Defendant impliedly promised her a workplace environment that would be free of sexual harassment and that its alleged breach of that promise amounts to a violation of its duty of good faith and fair dealing. Plaintiff has cited no support for this seemingly unbridled interpretation of this doctrine.[11] Indeed,

---

[11] Such a construction would automatically render, for example, alleged violations of internal workplace rules a breach of the duty of good faith. However, this Court has rejected such a construction of this law. *See Garnett v. Legislature of the V.I.*, 2014 WL 902502, at *6 (D.V.I. Mar. 7, 2014) ("employer violations of their own 'handbooks' or internal person[ne]l rules are not actionable, absent some indication that those rules were intended to create a contract with employees."); *Fraser v. Kmart Corp.*, 2009 WL 1124953, at *14 (D.V.I. Apr. 24, 2009) ("where an employer reserves to itself the absolute discretion to modify, amend or alter the rules without

such a reading of the covenant of good faith and fair dealing would appear to automatically render virtually every alleged wrongdoing by an employer a violation of the covenant, effectively negating any concepts of contract or fraudulent or deceitful conduct which are integral elements of this claim. This is clearly not its intended meaning, and Plaintiff has cited no legal authority that suggests otherwise.

For the foregoing reasons, the Court will enter summary judgment in favor of Defendant on Plaintiff's claim that Defendant violated the duty of good faith and fair dealing.

## IV.    CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part Defendant's Amended Motion for Summary Judgment.[12] Specifically, the Court will grant Defendant's Motion as to Plaintiff's claims for wrongful termination, defamation, and breach of the duty of good faith and fair dealing, and will deny Defendant's Motion as to the claims for sexual harassment, retaliation and violations of the Virgin Islands Civil Rights Act.

An appropriate Order accompanies this Memorandum Opinion.

Date:   August 31, 2020                         _____/s/_____
                                                WILMA A. LEWIS
                                                Chief Judge

---

any input whatsoever from the employee, the employer's personnel policies are not intended to constitute an employment contract.").

[12] As noted earlier, Plaintiff concedes that summary judgment is appropriate for her claims of wrongful termination and defamation. Thus, the Court need not address these claims.